**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No.  4:20-cv-547 |
| v. | ) | |
| | ) | |
| US DEVELOPMENT GROUP, LLC, USD, LLC, | ) | |
| and CBRH HOLDINGS, LLC | ) | COMPLAINT |
| | ) | |
| Defendants. | ) | |
| ————————————————————— | ) | |

The United States of America ("United States"), by the authority of the Attorney General
of the United States and on behalf of the Administrator of the United States Environmental
Protection Agency ("EPA"), files this Complaint and alleges as follows:

## **INTRODUCTION**

1.     This is a civil action brought against US Development Group, LLC ("USDG"),
USD, LLC ("USDL"), and CBRH Holdings, LLC ("CBRH") (collectively, "Defendants")
pursuant to Section 113(b) of the Clean Air Act ("CAA") or the ("Act"), 42 U.S.C. § 7413(b), for
violations of the Prevention of Significant Deterioration ("PSD") provisions and underlying
regulations, 42 U.S.C. §§ 7470-7492 and 40 C.F.R. § 52.21, and, alternatively, the Federal Minor
New Source Review Program in Indian Country ("Tribal MNSR") regulations, 40 C.F.R.
§§ 49.151-49.165, and the New Source Performance Standards ("NSPS") and underlying
regulations, 42 U.S.C. § 7411 and 40 C.F.R. Part 60, Subparts A and KB.

2.     Plaintiff alleges that Defendants failed to obtain the required permit under the
PSD program and/or the Tribal MNSR program prior to construction and operation of the Van

Hook Crude Terminal ("VHCT" or the "Facility"), a crude oil truck-to-rail transloading facility, located in Montrail County, North Dakota, on the Fort Berthold Indian Reservation ("FBIR").

3.      Plaintiff further alleges that Defendants failed to operate the Facility as required pursuant to the Facility's permit issued under the Tribal MNSR program and Subparts A and Kb of the NSPS program, including providing required notices and reports, and conducting required monitoring, recordkeeping, reporting, testing, and inspections.

4.      The United States seeks civil penalties against Defendants to address these past violations as authorized by Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

5.       The United States also seeks a declaration of liability against USDG, USDL and/or CBRH for the violations of the CAA at the Facility which they formerly owned and/or operated, under a direct operator theory, and a declaration of liability against USDG, USDL, and/or CBRH pursuant to an alter ego theory and/or other veil piercing theory.  USDG, through its wholly owned subsidiary CBRH, owned all of the issued and outstanding membership interests of Van Hook Crude Terminal, LLC ("VHCTL"), and was inextricably involved directly, and through USDL, in the acts that are the subject of this action.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action under Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and under 28 U.S.C. §§ 1331, 1345, and 1355.

7.      Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1395, as well as Section 113(b) of the CAA, 42 U.S.C. § 7413(b), because it is the judicial district in which Defendants are located, reside, and/or are doing business.

## DEFENDANTS

8.      Defendant USDG is a Delaware limited liability company with its principal place of business in Houston, Texas. USDG is a former owner and operator of the Facility from August 1, 2011, through December 12, 2012.

9.      Defendant USDL is a Delaware limited liability company with its principal place of business in Pasadena, Texas.  USDL was the "manager" and/or operator of the Facility from August 1, 2011, through December 12, 2012.

10.      Defendant CBRH is a Delaware limited liability company and was the sole "managing member" of, and the sole owner of all common unit interest in, VHCTL.

## STATUTORY AND REGULATORY REQUIREMENTS

11.      The primary purpose of the Act is to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of the population. 42 U.S.C. § 7401(b)(1).

### National Ambient Air Quality Standards and Implementation Plans

12.      Section 109 of the CAA, 42 U.S.C. § 7409, requires the EPA to establish National Ambient Air Quality Standards ("NAAQS") for certain air pollutants. These standards are published at 40 C.F.R. Part 50. The NAAQS establish primary air quality standards to protect the public health and secondary air quality standards to protect the public welfare.

13.      Section 110(a)(2)(C) of the CAA, 42 U.S.C. § 7410(a)(2)(C), sets forth the permitting programs that are required as a means of assuring attainment and maintenance of the NAAQS. The permitting programs are referred to collectively as the New Source Review ("NSR") program, and includes the Tribal MNSR.

## **Prevention of Significant Deterioration Program**

14.     Title 1, Part C of the CAA, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as either in attainment or unclassifiable for purposes of meeting the NAAQS (hereinafter, "PSD Program"). These requirements are designed to protect the public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision-making process.

15.     Section 165(a) of the CAA, 42 U.S.C. § 7475(a), and 40 C.F.R § 52.21(a)(2)(i)-(iii) prohibit the construction of a major emitting source or major modification in an area designated as attainment without a PSD permit.

16.     40 C.F.R. § 52.21(b)(1)(i)(a) and (b) define "major stationary source" as, among other things, a specified stationary source that emits or has the potential to emit 100 tons per year or more of any regulated NSR pollutant, or any other source with the potential to emit 250 tons per year or more of a regulated NSR pollutant, subject to regulation under the Act.

17.     40 C.F.R. § 52.21(b)(50) defines "regulated NSR pollutant" as, among other things, any pollutant for which a national ambient air quality standard has been promulgated.

18.     40 C.F.R. § 52.21(b)(11) defines "begin actual construction" as, in general, an initiation of physical on site construction activities on an emissions unit which are of a permanent nature including, but not limited to, installation of building supports and foundations, laying underground pipework, and construction of permanent storage structures.

19.     Under 40 C.F.R. § 52.21(r)(1), any owner or operator who commences construction or modification of a major source without applying for and receiving approval for such construction or modification is subject to appropriate enforcement action.

### Tribal Minor New Source Review Program

20.     Sections 301(a) and (d)(4) of the CAA, 42 U.S.C. §§ 7601(a) and (d)(4), authorize EPA to promulgate regulations and administer programs for Indian tribes to carry out the requirements of the Clean Air Act.

21.     Section 110(a)(2)(C) of the CAA, 42 U.S.C. § 7410(a)(2)(C), requires that every implementation plan include a program that provides for the enforcement of enforceable emission limitations and other control measures, means, or techniques, and regulates the construction and modification of any stationary source within the areas covered by the plan to ensure attainment with the NAAQS.

22.     The Tribal MNSR program establishes a pre-construction permitting program for all new and modified minor sources and minor modifications at major sources located in Indian Country and provides a mechanism for an otherwise major source to voluntarily accept restrictions on its potential to emit to become a synthetic minor source.

23.     Under 40 C.F.R. § 49.158, a synthetic minor source permit may be obtained to establish a synthetic minor source for purposes of the applicable PSD, nonattainment major NSR or CAA Title V program and/or a synthetic minor Hazardous Air Pollutant ("HAP") source for purposes of Part 63 of the Act or the applicable CAA Title V program. Any source that becomes a synthetic minor source for NSR and Title V purposes but has other applicable requirements or becomes a synthetic minor for NSR but is major for Title V purposes, remains subject to the applicable Title V program. Proposals to construct or modify a synthetic minor source are also

subject to the preconstruction permitting requirements in 40 C.F.R. §§ 49.154 and 49.155, except for the permit application content and permit application completeness provisions included in 40 C.F.R. § 49.154(a)(2) and (b).

24.     The Tribal MNSR program also establishes operating permit requirements for emission units within facilities that require a permit.  Emission units are subject to the emissions limitations within the permit.   Additional requirements such as monitoring, recordkeeping, reporting, and testing requirements are also imposed by the permit to assure compliance with emission limitations on units within the facility.  40 C.F.R. § 49.155(a)(1)(ii) and (iii).

25.     The provisions of the Tribal MNSR program apply to all Indian reservation lands where no EPA-approved program is in place and all other areas of Indian country where no EPA-approved program is in place and over which an Indian tribe, or the EPA, has demonstrated that a tribe has jurisdiction. 40 C.F.R. § 49.151(c)(1).

26.     To construct a new synthetic minor source on or after August 30, 2011, a permit must be obtained pursuant to 40 C.F.R. § 49.158 prior to beginning construction. 40 C.F.R. §§ 49.151(c)(1)(ii)(A) and 49.153(a)(3)(i).

27.     40 C.F.R. § 49.152(d) defines "begin construction," in general, as "initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying underground pipework and construction of permanent storage structures."

28.     An owner or operator of a new source is subject to appropriate enforcement action for the failure to apply for and receive a permit pursuant to the Tribal MNSR program or the failure to construct or operate its source in accordance with the terms of its MNSR permit. 40 C.F.R. § 49.151(d)(1) and (2).

### New Source Performance Standards

29.     Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires EPA to publish and periodically revise a list of categories of stationary sources including those categories that, in EPA's judgment, cause or contribute significantly to air pollution which may reasonably be anticipated to endanger public health or welfare.

30.     Once a stationary source category is included on the list, Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), requires EPA to promulgate a federal standard of performance for new sources within the category, also known as a NSPS.  Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating that source in violation of any standard of performance after the effective date of the NSPS applicable to such source.

31.     "New source" is defined as any stationary source, the construction or modification of which is commenced after the publication of the NSPS regulations or proposed NSPS regulations applicable to such sources. 42 U.S.C. § 7411(a)(2).

32.     "Stationary Source" is defined as a building, structure, facility, or installation which emits or may emit any air pollutant. 42 U.S.C. § 7411(a)(3).

33.     Pursuant to Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), EPA has promulgated regulations that apply to the owner or operator of any stationary source which contains an affected facility.  40 C.F.R. § 60.1(a).

34.     40 C.F.R. § 60.2 defines "affected facility," with reference to a stationary source, as any apparatus to which a standard is applicable.

35.     Pursuant to Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), EPA has promulgated NSPS for affected facilities defined as volatile organic liquid ("VOL") storage

vessels with a capacity greater than or equal to 75 cubic meters that are constructed after July 23, 1984. 40 C.F.R. Part 60, Subpart Kb.

36.     As set forth in 40 C.F.R. §§ 60.7(a)(1) and (a)(3), any owner or operator shall furnish the Administrator written notification or, if acceptable, electronic notification of: 1) the date construction of an affected facility is commenced, postmarked no later than 30 days after such date; and 2) the actual date of initial startup of the affected facility within 15 days after such date.

37.     As set forth in 40 C.F.R. § 60.112b(a), the owner or operator of a storage vessel with a design capacity greater than or equal to 151 cubic meters (or approximately 40,000 gallons) and containing a VOL, as stored, with a maximum true vapor pressure equal to or greater than 5.2 kilopascals ("kPa") but less than 76.6 kPa shall equip each storage vessel with certain types of controls including a fixed roof in combination with an internal floating roof ("IFR") meeting certain specifications.

38.     As set forth in 40 C.F.R. § 60.113b(a)(1), the owner or operator of a storage vessel with a fixed roof and an IFR shall conduct visual inspections of the IFR, the primary seal, and the secondary seal (if one is in service) prior to filling the storage vessel with VOL. If there are holes, tears, or other openings in the primary seal, the secondary seal, or the seal fabric or defects in the IFR, or both, the owner or operator shall repair the items before filling the storage vessel.

39.     As set forth in 40 C.F.R. § 60.113b(a)(5), each owner or operator of a storage vessel with a fixed roof and an IFR shall notify the Administrator in writing at least 30 days prior to the filling or refilling of each storage vessel for which an inspection is required to afford EPA the opportunity to have an observer present.

40.     As set forth in 40 C.F.R. § 60.115b(a)(1), the owner or operator shall furnish the Administrator with a report that describes the control equipment and certifies that the control equipment meets the specifications set forth in the regulations.

## FACILITY DESCRIPTION AND BACKGROUND

41.     The Facility was a crude oil truck-to-rail transloading facility, which accepted crude oil transported by truck from the Bakken Shale formation for offloading into crude oil storage vessels (tanks). From the storage tanks, the crude oil was loaded onto rail cars so that it could ultimately be delivered to market.

42.     The Facility included five crude oil storage tanks (two tanks with 6,000 barrels capacity each and three tanks with 95,000 barrels capacity each), eight truck load-out stations, and at least nine rail loading stations. Each of the crude oil storage tanks was equipped with a fixed roof and an IFR for control of volatile organic compounds ("VOC") emissions. The truck off-loading stations used submerged filling arms and piping to the tanks. The tanks acted as intermediate storage between the truck or pipelines that delivered the crude oil to the Facility and the rail cars that transported the crude oil to its final destination. Occasional direct loading from trucks to railcars may have occurred, thus bypassing and avoiding emissions associated with the tanks.

43.     On October 5, 2011, VHCTL submitted an application to EPA for a Tribal MNSR permit. The permit application indicates a VOC potential to emit ("PTE"), before controls, of 4,007 tons per year.

44.     The Tribal MNSR permit ("the Permit") was issued by EPA on August 2, 2012, with an effective date of September 1, 2012.

45.     Construction of the Facility began between September 1, 2011, and October 19, 2011.

46.     Upon information and belief, USDG began using the Facility for transloading purposes on or about February 1, 2012.

## BUSINESS ENTITY BACKGROUND

47.     USDL was formed on June 21, 2002, and is a wholly owned subsidiary of USDG.

48.     CBRH was formed on December 18, 2009, and is a wholly owned subsidiary of USDG.

49.     VHCTL was formed on August 8, 2011, and is an affiliate of USDG and wholly owned subsidiary of CBRH.

50.     In an August 1, 2011, Management Agreement ("Management Agreement"), VHCTL contracted with USDL to provide developing, marketing, and administrative services to VHCTL, including compliance oversight for all necessary governmental and regulatory permits required to legally maintain the Facility.

51.     In an August 8, 2011, Limited Liability Company Agreement ("LLC Agreement") filed with the State of Delaware, USDG, through CBRH, formed VHCTL. The LLC Agreement lists CBRH as the managing and sole member of VHCTL, owning all issued and outstanding membership interests.

52.     CBRH contributed $1,000.00 in cash for the operation of VHCTL through the LLC Agreement.

53.    Under the LLC Agreement, USDG, through CBRH, had the sole authority to conduct the business affairs of VHCTL, including the power to act for and on behalf of VHCTL, or otherwise bind VHCTL in any way.

54.    From August 2011 through December 2012, USDG officers were appointed as officers or directors of VHCTL and treated as interchangeable.

55.    On December 12, 2012, USDG sold VHCTL and the Facility to Plains All American Pipeline, L.P. ("PAALP"). The Management Agreement between USDG and VHCTL was also concurrently terminated upon the sale and acquisition.

56.    Upon information and belief, at the time of the sale to PAALP, VHCTL's tangible assets consisted of a bank account with a balance of $0.00 and the equipment then comprising the Facility.  VHCTL's only intangible assets at the time of the sale were various service contracts.

## GENERAL ALLEGATIONS

57.    The Defendants named herein are "persons" as defined in Section 302(e) of the CAA, 42 U.S.C. § 7602(e), and applicable federal regulations.

58.    From August 1, 2011, to December 12, 2012, USDG, either directly or through USDL and/or CBRH, took responsibility for the management, direction, and control of environmental compliance at the Facility owned and/or operated by VHCTL – particularly the decision to proceed with construction and operation of the Facility without a permit.  As a result, USDG, USDL, and/or CBRH are directly liable as owners and/or operators at the time of the CAA violations at the Facility at issue in this case.

59. USDG, either directly or through USDL and/or CBRH, dominated and controlled VHCTL to such a degree that USDG, USDL, and/or CBRH, was the alter ego of VHCTL and, therefore, is liable for the violations of the CAA at issue in this case.

60. At all relevant times, Defendants did business in North Dakota and Texas.

61. Defendants owned and/or operated the Facility.

62. Facility operations generate VOCs that are "criteria pollutants," as that term is defined in Section 108 of the CAA, 42 U.S.C. § 7408.

63. The Facility is otherwise a "major stationary source" within the meaning of the CAA, PSD and attainment NSR regulations, including the Tribal MNSR regulations.

64. The Facility is a "stationary source" within the meaning of the CAA and the NSPS.

65. USDG, USDL, and/or CBRH were required to obtain either a PSD or Tribal MNSR permit prior to construction of the Facility.

66. USDG, USDL, and/or CBRH, acting either directly or through VHCTL, constructed the Facility that is the subject of this Complaint from on or about September 1, 2011, to on or about January 28, 2012.

67. USDG, acting either directly or through USDL, CBRH, and/or VHCTL, operated the Facility from on or about January 29, 2012, until December 12, 2012.

## FIRST CLAIM FOR RELIEF
### (New Source Review/Prevention of Significant Deterioration (NSD/PSD))

68. The allegations in Paragraph 1 through 67 are hereby realleged and incorporated by reference as if fully set forth herein.

69. According to Defendants' synthetic minor permit application, the Facility had a VOC PTE, before controls, of 4,007 tons per year.

70.     Upon information and belief, sometime between September 1, 2011, and October 19, 2011, Defendants commenced construction of the Facility.

71.     On August 2, 2012, EPA approved Defendants' application for a synthetic minor permit to construct and operate under the Tribal MNSR program. The Facility permit was issued to VHCTL with an effective date of September 1, 2012.

72.     Defendants' Facility was a major source under the PSD regulations until the date when the EPA-issued Tribal MNSR synthetic minor permit for the Facility became effective on September 1, 2012.

73.     Defendants did not apply for or obtain a PSD permit authorizing the construction of the Facility.

74.     Defendants were in violation of the PSD program permit requirements set forth in Section 165 of the CAA, 42 U.S.C. § 7475, because they failed to obtain a PSD permit for the Facility prior to the construction of the Facility.

75.     In failing to obtain a PSD permit for the Facility prior to the construction of the Facility, Defendants violated Section 165 of the CAA, 42 U.S.C. § 7475, by constructing the Facility without a PSD permit.

76.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), 40 C.F.R. §§ 19.2 and 19.4 – Table (2018), and 74 Fed. Reg. 6262 (Jan. 7, 2009), Defendants are subject to civil penalties not to exceed $37,500 per day for each violation on or after January 12, 2009.

**SECOND CLAIM FOR RELIEF**
**(Tribal MNSR Violations) (In the Alternative to the First Claim for Relief)**

77.     The allegations in Paragraphs 1 through 76 are hereby realleged and incorporated by reference as if fully set forth herein.

78.     The Tribal MNSR regulations require that "if you begin construction of a new source . . . without applying for and receiving a permit . . . you will be subject to appropriate enforcement action." 49 C.F.R. § 49.151(d)(1).

79.     On or about October 5, 2011, VHCTL submitted a permit application to EPA requesting a synthetic minor construction permit for the Facility under the Tribal MNSR permitting program.  The accompanying cover letter was signed by Mike Day, Vice President of USDG and VHCTL, and was submitted on USDG letterhead.

80.     Upon information and belief, sometime between September 1, 2011, and October 19, 2011, Defendants commenced construction of the Facility without first obtaining the synthetic minor permit applied for on October 5, 2011.

81.     Defendants began operating the Facility on or about January 29, 2012, or February 1, 2012.

82.     On August 2, 2012, EPA approved Defendants' request to construct and operate the Facility and issued a synthetic minor permit to VHCTL for the Facility with an effective date of September 1, 2012.

83.     Defendants unlawfully began construction of the Facility without obtaining an EPA-issued synthetic minor permit required under the Tribal MNSR regulations, 40 C.F.R. §§ 49.151-49.165.  Defendants knew that construction of the Facility could not legally commence without first obtaining a permit, but chose to proceed with construction and operation parallel to the permit application process.

84.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), 40 C.F.R. §§ 19.2 and 19.4 – Table (2018), and 74 Fed. Reg.  626 (Jan. 7, 2009), Defendants are subject to civil penalties not to exceed $37,500 per day for each violation on or after January 12, 2009.

## THIRD CLAIM FOR RELIEF
### (NSPS Violations)

85.     The allegations in Paragraphs 1 through 84 are hereby realleged and incorporated by reference as if fully set forth herein.

86.     At all times relevant to this Complaint, Defendants' Facility included at least three VOL storage tanks.

87.     The Facility included five storage tanks, identified herein by their Emission Unit ID number in the Tribal MNSR permit application: Tank 1 - 6,000 barrels ("bbl" (TK01)); Tank 2 – 6,000 bbl (TK02); Tank 3 – 95,000 bbl (TK03); Tank 4 – 95,000 bbl (TK04); and Tank 5 – 95,000 bbl (TK05).

88.     The Facility's storage tanks are "affected facilities" under 40 C.F.R. § 60.110b and are therefore subject to the requirements of 40 C.F.R. Part 60, Subpart Kb, including the operational and emission limits, testing, and recordkeeping and reporting requirements set forth in 40 C.F.R. §§ 60.110b to 60.117b and 40 C.F.R. Part 60, Subpart A.

89.     Defendants failed to comply with the applicable requirements of Subparts A and Kb, in violation of 40 C.F.R. § 60.7 and one or more provisions of 40 C.F.R. §§ 60.110b to 60.117b, and Section 111 of the Act, 42 U.S.C. § 7411.

90.     Defendants failed to conduct visual inspections of Tank 1 (TK01), Tank 2 (TK02), and Tank 3 (TK03) prior to filling, as required under 40 C.F.R. § 60.113b(a).

91.     Defendants failed to submit notifications for commencement of construction and startup for Tank 1 (TK01), Tank 2 (TK02), and Tank 3 (TK03), as required under 40 C.F.R. §§ 60.7(a)(1) and  60.7(a)(3).

92.     Defendants failed to submit notifications within 30 days prior to filling for storage Tank 1 (TK01) and Tank 2 (TK02), as required under 40 C.F.R. § 60.113b(a)(5).

93.     Defendants failed to submit a report that describes the control equipment and certifies that the control equipment meets the specifications of 40 C.F.R. §§ 60.112b(a)(1) and 60.113b(a) for Tank 1 (TK01), Tank 2 (TK02), and Tank 3 (TK03), as required under 40 C.F.R. § 60.115b(a)(1).

94.     Defendants' storage tanks are "affected facilities" under 40 C.F.R. § 60.2 and are therefore subject to the requirements of 40 C.F.R. Part 60, Subpart A, including the notification requirements set forth in 40 C.F.R. § 60.7.

95.     Defendants failed to comply with the applicable requirements of Subpart A, in violation of one or more provisions of 40 C.F.R. § 60.7, and Section 111 of the Act, 42 U.S.C. § 7411.

96.     Defendants failed to provide notice of commencement of construction for Tank 1 (TK01), Tank 2 (TK02), and Tank 3 (TK03) as required by 40 C.F.R. § 60.7(a)(1).

97.     Defendants failed to provide notification of startup for Tank 1 (TK01), Tank 2 (TK02), and Tank 3 (TK03) as required by 40 C.F.R. § 60.7(a)(3).

98.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), 40 C.F.R. §§ 19.2 and 19.4 – Table (2018), and 74 Fed. Reg. 626 (Jan. 7, 2009), Defendants are subject to civil penalties not to exceed $37,500 per day for each violation on or after January 12, 2009.

## FOURTH CLAIM FOR RELIEF
### (Synthetic Minor Permit Violations)

99.     The allegations in Paragraphs 1 through 98 are hereby realleged and incorporated by reference as if fully set forth herein.

100.    An owner or operator of a new source is subject to appropriate enforcement action for the failure to construct or operate its source in accordance with the terms of its Tribal MNSR permit. 40 C.F.R. § 49.151(d)(2).

101.   On or about August 2, 2012, Defendants received a synthetic minor permit to construct the Facility, which was effective on September 1, 2012.  The Permit was amended on March 9, 2016.

102.   From its effective date, Permit Section II A.19 requires notification to EPA of the anticipated date of the Facility's initial start-up within 60 days of such date.

103.   Defendants failed to submit such notification to EPA for the Facility.

104.   Permit Sections I. G. 2(b) and (d) require testing of the enclosed combustor and the closed-vent system within 180 days after initial startup at the Facility.  The testing on the enclosed combustor was completed by PAALP on May 31, 2013.  The testing on the closed-vent system was completed by PAALP on or about August 27, 2013.

105.   Defendants failed to conduct required testing on the enclosed combustor and the closed-vent system within 180 days of startup as required by its Permit.

106.   Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), 40 C.F.R. §§ 19.2 and 19.4 – Table (2018) and 74 Fed. Reg. 626 (Jan. 7, 2009), Defendants are subject to civil penalties not to exceed $37,500 per day for each violation on or after January 12, 2009.

### FIFTH CLAIM FOR RELIEF
### (USDG is Liable as an Owner and/or Operator for all CAA Violations at the Facility)

107.   The allegations in Paragraphs 1 through 106 are hereby realleged and incorporated by reference as if fully set forth herein.

108.   From VHCTL's inception in August 2011 until its sale to PAALP in December 2012, USDG disregarded VHCTL's separate existence and controlled VHCTL's activities and assets to such an extent that VHCTL never operated as a separate business entity.

109.   USDG included VHCTL in its consolidated financial statement for the years ending December 31, 2010, and December 31, 2011.

110.    Upon information and belief, from VHCTL's inception in August 2011 until its sale to PAALP in December 2012, all of VHCTL's corporate officers and employees were also corporate officers or employees of USDG.

111.    Upon information and belief, corporate officers and employees of USDG treated VHCTL as interchangeable with USDG for USDG's business purposes.

112.    Upon information and belief, from VHCTL's inception in August 2011 until its sale to PAALP in December 2012, USDG corporate officers made financial decisions for VHCTL and the Facility.

113.    Upon information and belief, from VHCTL's inception in August 2011 until its sale to PAALP in December 2012, USDG's chief financial officer ("CFO") was also the CFO of CBRH and VHCTL.  USDG's CFO is also listed as the president of VHCTL and/or CBRH in the sale documents for VHCTL.

114.    On August 1, 2011, USDG's CFO signed a management agreement with USDL on behalf of VHCTL.

115.    On August 8, 2011, USDG corporate officers caused VHCTL's LLC Agreement to be filed with the state of Delaware.  USDG's CFO signed the LLC Agreement as treasurer of CBRH.

116.    On December 12, 2012, USDG signed a termination of the management agreement with USDL.  USDG's CFO signed the termination as CFO of USDG, and as a representative of CBRH, the managing member of VHCTL.

117.    On December 12, 2012, USDG's CFO resigned as an officer of VHCTL.

118.    Upon information and belief, from VHCTL's inception in August 2011 until its sale to PAALP in December 2012, USDG corporate officers made decisions on environmental and regulatory matters at the Facility.

119.    Upon information and belief, from VHCTL's inception in August 2011 until its sale to PAALP in December 2012, two different individuals holding the corporate position of vice president of USDG were also listed as vice presidents of VHCTL in sale documents for VHCTL.

120.    On August 13, 2011, a vice president of VHCTL wrote to the chief executive officer ("CEO") of USDG, stating that it was necessary to make a decision on the Facility so that USDG could receive both origin and destination revenues on all of the Facility's throughput via control of the customers through fleet leverage and network deals.

121.    On August 15, 2011, the CEO of USDG replied to the August 13, 2011, correspondence and stated that USDG needed a competitive loading option to protect its existing revenues and new destination options.  Upon information and belief, USDG's CEO was referring to the Facility as USDG's potential competitive loading option.

122.    From August 2011 to October 2011, a vice president of VHCTL exchanged numerous communications with various contractors hired by USDG to perform work at the Facility in order to determine how USDG was going to proceed with construction and permitting issues at the Facility.

123.    On September 27, 2011, a vendor submitted a letter addressed to VHCTL and USDG, with the attention line listing one of VHCTL's vice presidents.  The vendor letter included a reference to USDG in the heading.  This reference was crossed out by hand and edited to reference VHCTL.

124.     On or about October 5, 2011, a vice president of VHCTL used USDG letterhead to submit a permit application for a synthetic minor construction permit for the Facility to EPA Region 8.  The Facility's permit application also indicated that the VHCTL vice president was writing as a representative of VHCTL.

125.     On November 30, 2011, VHCTL submitted an Authority for Capital request for the Facility.  A vice president of VHCTL signed the document, which listed him as vice president of USDG.

126.     On September 12, 2012, a vice president of VHCTL wrote to USDG representatives, including USDG's CEO, and indicated that "our" air permit to construct had become fully activated.  Upon information and belief, "our" refers to USDG.

127.     On December 12, 2012, the two individuals listed as vice president of USDG resigned as officers of VHCTL.

128.     Upon information and belief, VHCTL had no employees separate from those also employed by USDG.

129.     Upon information and belief, a USDG employee was hired by USDG to be the Van Hook Terminal Manager in late 2011.

130.     On February 28, 2012, a vendor sent a purchase order to USDG and VHCTL. The purchase order was addressed to the USDG employee hired as Van Hook's Terminal Manger at a USDG email address.

131.     On March 21, 2012, a vendor sent a purchase order to USDG and VHCTL.  The purchase order was addressed to the USDG employee hired as Van Hook's Terminal Manger at a USDG email address.

132.    On July 26, 2012, the USDG employee hired as Van Hook's Terminal Manger stated in an email that he challenged a representative of EPA at the gates of the Facility who was asking questions about construction and permitting for the Facility.  At the time of this encounter, a USDG sign was erected outside of the Facility.

133.    On July 29, 2012, a USDG employee wrote to USDG's CEO to discuss a recent visit to the Facility by a representative from EPA.  The USDG employee referenced "our" draft permit to construct.  Upon information and belief, "our" refers to USDG.

134.    On July 30, 2012, a USDG employee stated that a representative from EPA was at the gates of the Facility the previous week asking questions about construction and permitting for the Facility.  He went on to state that when asked if the Facility had a permit, "our terminal manager" told them yes.

135.    On July 30, 2012, a USDG employee stated that what "we have" is a draft permit to construct and operate the Facility.  Upon information and belief, "we" refers to USDG.

136.    As alleged above, from August 1, 2011, to December 12, 2012, USDG, either directly or through USDL and/or CBRH, took responsibility for the management, direction, and control of environmental compliance at the Facility owned and/or operated by VHCTL – particularly the decision to proceed with construction and operation of the Facility without a permit.   As a result, USDG, and/or USDL and CBRH, is directly liable as an operator for the CAA violations at the Facility.

137.    USDG, either directly or through USDL and/or CBRH, dominated and controlled VHCTL to such a degree that it, and/or USDL and CBRH, was the alter ego of VHCTL and, therefore, is liable for the violations of the CAA at issue in this case.

138.    Since VHCTL's inception in August 2011, USDG has disregarded VHCTL's separate corporate or business existence, and dominated and controlled VHCTL's activities and assets to such an extent that VHCTL never operated as a separate entity.

139.    USDG disregarded corporate and business norms to such an extent that to recognize VHCTL as a separate company would be unjust to the Plaintiff in this case.

140.    USDG is both directly and derivatively liable for the activities of VHCTL.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the United States, respectfully requests that this Court:

A.    Determine that USDG, USDL and/or CBRH violated the CAA by constructing the Facility without obtaining a permit;

B.    Determine that USDG is directly liable as an operator of VHCTL's Facility;

C.    Determine that VHCTL was under such complete domination and control by USDG, USDL and/or CBRH that USDG, USDL, and/or CBRH are derivatively liable for the violations of the CAA by VHCTL, and that Defendant VHCTL was, at all times relevant to this Complaint, the alter ego of USDG, USDL and/or CBRH;

D.    Determine that USDG disregarded proper corporate or business norms to such an extent that to recognize VHCTL as a separate company and limit USDG's liability for the CAA violations at issue in this case would be unjust to the Plaintiff;

E.    Assess a civil penalty against USDG, USDL, and/or CBRH of up to $37,500 per day for each violation; and

F.    Grant the United States such other equitable relief as this Court deems just and proper.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

Attorney in Charge:        */s/ Devon A. Ahearn*
DEVON A. AHEARN (Bar No. CA 307275)
Trial Attorney
U.S. Department of Justice
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611
T: (202) 514-2717
F: (202) 514-0097
Devon.Ahearn@usdoj.gov

STACY D. COLEMAN (Bar No. DC 994961)
Trial Attorney
U.S. Department of Justice
Environmental Enforcement Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
T: (303) 844-7240
F: (303) 844-1350
Stacy.Coleman@usdoj.gov

RYAN K. PATRICK
United States Attorney
Southern District of Texas

Local Counsel:        */s/ Daniel D. Hu*
DANIEL D. HU
Assistant United States Attorney
State Bar No. 10131415
S.D. I.D. 7959
Southern District of Texas
1000 Louisiana, Suite 2300
Houston TX 77002
T: (713) 567-9518
F: (713) 718-3303
Daniel.Hu@usdoj.gov